WEST END TENANTS ASSOCIATION, et al., Intervenor–Appellants,

v.

GEORGE WASHINGTON UNIVERSITY, et al., Appellees.

DISTRICT OF COLUMBIA, Appellant,

v.

GEORGE WASHINGTON UNIVERSITY, et al., Appellees.

Nos. 91–CV–667, 91–CV–706.

District of Columbia Court of Appeals.

Argued Feb. 3, 1993.
Decided April 21, 1994.

---

720

Richard C. Eisen, Washington, DC, for intervenor-appellants West End Tenants Ass'n, et al.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief for appellant District of Columbia.

Vincent C. Burke, III, with whom Thomas D. Quinn, Jr., and Jack M. H. Frazier, Washington, DC, were on the brief for appellee George Washington University.

Eric Von Salzen, Washington, DC, with whom Lee E. Berner, McLean, VA, was on the brief for appellees Thomas A. Bradford, et al.

Before STEADMAN * and SULLIVAN, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

Appellants, District of Columbia (the "District") and intervenor, the West End Tenants Association ("Tenants"),[1] appeal from summary judgment entered in favor of the George Washington University ("GWU") and the owners of the West End Building (the "Owners").

■ The District and Tenants sought declaratory and injunctive relief against GWU and the Owners of the West End, an 86–unit apartment building located at 2124 I Street, N.W. (the "West End") and GWU, pursuant to the Rental Housing Conversion and Sale Act of 1980 (the "Sale Act"),[2] as amended by the Tenant Opportunity to Purchase Clarification Amendment Emergency Act of 1989,[3] (the "Clarification Act") and pursuant to the George Washington University Higher Education Facilities Revenue Bond Act of 1981 (the "Bond Act").[4] In particular, they sought a declaration that Tenants had been deprived of their rights under the Sale Act as a result of a lease agreement between GWU and the Owners, dated August 1, 1988, (the "Master Lease"), and also sought an injunction requiring that those rights be effectuated. They further sought a declaration that the Master Lease violated the Bond Act agreement and an injunction barring its enforcement. Finally, they asked that the court order "the owners to give the tenants their opportunity to purchase and/or their right of first refusal with respect to the purchase" of the accommodation.

In granting appellees' motion for summary judgment, the trial court ruled that the retroactive application of the Clarification Act would be unconstitutional because, *inter alia,* it would violate the Contract Clause of the Constitution.[5] The trial court was unpersuaded that GWU violated the Bond Act. It rejected the argument that the Master Lease was equivalent to a "sale" under the Sale Act of 1980, and ruled that when the Owners and GWU entered into the Master Lease agreement in 1988, they were not required to afford the Tenants notice and an opportunity to purchase. We affirm.

## I.

We set forth in some detail the facts that bear upon the issues (1) whether the trial court erred in ruling that the Master Lease did not effect a "sale" for the purpose of triggering certain statutory rights of Tenants under the Sale Act, and (2) whether the Clarification Act had the effect of clarifying or redefining the terms of the Sale Act in such fashion as to make a "sale" of the lease transaction entered into by GWU and the Owners.

* Former Chief Judge Rogers was a member of the division that heard oral argument in this case. After her departure from the court, Associate Judge Steadman was selected by lot to replace her.

1. The Tenants Association was joined in intervention by several individually-named tenants. The appeals of these individual-tenant appellants will be dismissed for lack of standing. D.C.Code § 45–1640 (1990 Repl.) specifies the manner in which negotiations must be conducted when a housing accommodation having five or more units is being sold. As a preliminary step to entering into a valid contract of sale with an owner, the tenants of such an accommodation must form a tenant organization registered with the Mayor. "Upon registration, the organization constitutes the sole representative of the tenants, and the [owner's] prior offer of sale is deemed an offer to the organization." D.C.Code § 45–1640(1) (1990 Repl.). D.C.Code § 45–1638 (1990 Repl.), which prescribes the statutory method of affording tenants the right to purchase, does not give the individual tenant an opportunity to negotiate with the owner or to purchase in the tenant's own right. Accordingly, "if the conduct of an owner gives rise to any basis for a civil action against the owner under § 45–1653, it is only the tenant organization that is 'aggrieved' as that term is used in § 45–1653 and, therefore, it is only the tenant organization that can bring a civil action against the owner under the statute." *Stanton v. Gerstenfeld,* 582 A.2d 242, 245 (D.C.1990).

2. D.C.Code § 45–1601 *et seq.* (1990 Repl. & 1993 Supp.).

3. D.C.Code § 45–1631(b) (1990 Repl.).

4. 28 D.C.Reg. 4758 (1981); *see also* D.C.Code § 47–334 (1990 Repl.).

5. U.S. Const. art. I, § 10, cl. 1.

## 1. The Bond Act

GWU made certain promises regarding tenants' rights in order to secure passage of the Bond Act. On July 27, 1981, in response to efforts by GWU, the Bond Act was referred to the Committee on Finance and Revenue of the Council of the District of Columbia. The Bond Act "authorize[d] the District of Columbia to issue up to $30 million in revenue bonds for the purpose of providing funds [to GWU] for the construction of an 'academic cluster' and the improvement of several existing buildings to provide greater fire safety and access" for persons with disabilities. COMMITTEE ON FINANCE AND REVIEW, REPORT ON BILL 4–303, THE GEORGE WASHINGTON UNIVERSITY HIGHER EDUCATION FACILITIES REVENUE BOND ACT OF 1981 (1981).

During the course of public hearings on the bill, residents of the Foggy Bottom area voiced concern that "passage of the act would make it possible for the University to acquire two multi-family rental housing buildings located within the campus plan area of the University." Of particular concern was the future of the West End Apartments at 2124 I Street, N.W., and the Schenley Apartments at 2121 H Street, N.W.

Responding to these concerns, GWU, on September 24, 1981, submitted a "Statement regarding the University's intentions concerning the West End and Schenley Apartments" to the Committee on Finance and Revenue. It provided, in pertinent part:

1. The University will not initiate negotiations with the owners of the West End Apartments or the Schenley Apartments for the purpose of purchasing either of these buildings.
2. In the event that the owners of the West End and Schenley Apartments offer the buildings for sale, the University will not offer or enter into a contract for the purchase of these buildings, except in conjunction with the tenants' exercise of their rights to purchase the property under prevailing laws of the District of Columbia.
3. If after compliance with points 1 and 2 above, the University acquires through purchase the West End and/or Schenley apartment buildings, the University will maintain the buildings as rental housing under the provisions of the prevailing laws of the District of Columbia.

\* \* \* \* \* \*

The University would have the right to use any voluntarily vacated units for student tenancy.

This agreement will remain in effect for a period of ten years.

*See id.* at 23.

With these assurances, the Council passed the Revenue Bond Act. It became law on December 23, 1981, D.C.Law 4–58, 28 D.C.Reg. 4758 (1981).[6]

## 2. 1988 Master Lease Agreement

A review of the events that led up to the signing of the Master Lease Agreement and of the provisions of that agreement will aid our consideration of whether the agreement violates the Sale Act or other applicable statutes.

In 1982, Thomas Bradford, Jr., one of the owners, spoke with then university Assistant Treasurer Maurice K. Heartfield, Jr. and inquired whether the university was interested in purchasing the West End. Mr. Bradford also expressed his interest in exploring the mutual advantages to both the Owners and GWU of a renovation and long-term lease. GWU responded by providing Mr. Bradford with a copy of the assurances it had given the Council in connection with the Bond Act. All negotiations then ceased for some five years, until May 4, 1987, when Mr.

---

6. Apparently, at least one citizens association, the Foggy Bottom Association, changed its vote and supported passage of the Bond Act. In a letter dated September 29, 1991, Maureen K. Holscher, Vice–President of the Foggy Bottom Association noted that "[t]his voting change is a result of the discussions between John Wilson and the University over the concerns of the Foggy Bottom area. Housing has been a major concern of ours for some time, particularly the West End Apartments and the Schenley Apartments that are located within the boundaries of the George Washington University Master Plan. It is encouraging to see that the university is willing to cooperate with the ANC [Advisory Neighborhood Commission] and Foggy Bottom Association."

Bradford again inquired as to whether the university was interested in the premises. The negotiations which followed led to several proposals culminating in the transmittal to Mr. Bradford on May 12, 1989, of an initial draft of the Master Lease.

At about this time, the university's counsel, Vincent C. Burke, III, had a telephone conversation with Mr. Byron Hallstead of the District of Columbia Consumer and Regulatory Affairs Conversion and Sale Office regarding the lease agreement.[7] Without revealing the parties involved, Mr. Burke presented Mr. Hallstead with a hypothetical situation based on the facts of the Master Lease. Mr. Hallstead stated that such an agreement would not violate the Sale Act as the agreement (1) constituted a lease and not a sale, and (2) recognized the rights of the tenants to purchase before any purchase by the university.

Prior to signing the lease, GWU Vice–President and Treasurer Charles E. Diehl called Councilmember John Wilson to inquire if Mr. Wilson believed that such a lease was in accordance with the University's Bond Act assurances. Mr. Wilson, according to Mr. Diehl, responded orally that, given the Master Lease's explicit recognition of the tenants' right to purchase, it was his opinion that it did not violate the Bond Act assurances.[8]

On August 1, 1988, the university entered into a lease agreement (the "Master Lease") with the owners of the West End Apartments for a period of ten years at a rate of $25,000 monthly, or $300,000 each year. The university was granted the "exclusive right to purchase" the apartment building at the end of the ten-year period (on July 31, 1998) for $6 million, minus a $100,000 credit per rental year, for a net amount of $5 million. This option was made "expressly subject and subordinate to the tenants' rights pursuant to the District of Columbia Rental Housing Conversion and Sale Act. . . ." It recognized that GWU must "comply with the District of Columbia Rental Housing Conversion and Sale Act and any successor or similar act in existence at the time a contract of sale is entered into, and provide the notices required by the Act relating to said sale and to the exercise of tenants' statutory rights of purchase under said Act." [9]

---

7. Defendants' Joint Answers to Interrogatories, No. 10 (Supplemental Record on Appeal).

8. On August 11, 1988, a meeting was held between the Tenants and university representatives, the purpose of which was to apprise the Tenants of the Master Lease. Councilmembers John Wilson and William P. Lightfoot (not then a Council member) were in attendance.

9. Specifically, paragraph 18 of the Master Lease accommodated the possibility that Tenants might exercise their right to purchase by providing, in part:

> The cash payment called for above shall be made at closing which shall take place within ninety (90) days of the date of execution and delivery of the contract but in no event later than July 31, 1998, *subject to the rights of any residential tenants to purchase the Leased Premises,* if any, under existing law at the date of the ·contract (hereinafter "Closing Date"). In the event of any such rights, closing shall occur within ninety (90) days after expiration of any said tenants' rights to purchase the Leased Premises, provided, that in such event, the terms of this Lease shall be automatically extended until the date of such closing but not later than July 31, 2000, upon the same terms and conditions set forth herein . . ., and the

parties agree to negotiate in good faith regarding any further extension thereof in the event the tenants' rights have not expired. . . .

> *Landlord warrants and represents that it shall comply with the District of Columbia Rental Housing Conversion and Sale Act* and any successor or similar act in existence at the time said contract of sale is entered into, and provide the notices required by the Act relating to said sale and to the exercise of tenants' statutory rights of purchase under said Act.

> \* \* \* \* \* \*

> *This option to purchase shall be expressly subject and subordinate to the tenants' rights* pursuant to the District of Columbia Rental Housing Conversion and Sale Act of the University's tenants of the Leased Premises. The University shall be solely responsible for any settlements or other consideration it agrees to pay to the tenants in connection with the aforementioned rights.

> \* \* \* \* \* \*

In addition, paragraph 18(f) of the Master Lease provides:

> If at any time after the execution of the Lease Agreement and prior to August 31, 1990, individual(s) who make up the Landlord desire(s) to sell interests aggregating no more than 49 percent of Landlord's ownership interest as tenants in common in the Leased Premises . . .,

The Master Lease, in addition to giving GWU control over all equipment on the premises, supplies, and transferable permits, as well as the right to challenge any real estate assessments, obligated the university to pay all real property taxes and utilities, to perform all maintenance and repairs, and to obtain all non-transferable permits and purchase liability insurance. The owners, besides holding record title, reserved the right to prevent the university from making any alterations, improvements, or additions to the apartment, to reenter the premises in the event of noncompliance with the lease provisions, and to veto any assignment of rights by the university under the lease.

### 3. Passage of The Clarification Act

In December 1988, the District of Columbia filed in Superior Court its initial complaint against GWU and the Owners. The West End Tenants Association ("Tenants") and individual tenants subsequently moved to intervene in the action and were granted intervenor status on July 14, 1989. In the interim, following protests from neighborhood groups and the Tenants, the Council Committee on Consumer and Regulatory Affairs proposed amending the Sale Act. As a

result of a committee-sponsored roundtable conference, the Chairman of the Committee on Consumer and Regulatory Affairs introduced Bill 8–188, the Tenant Opportunity to Purchase Clarification Amendment Act of 1989 on February 28, 1989. That bill was approved on August 1, 1989, and became law on October 19, 1989. See 36 D.C.Reg. 5790–92 (1989).[10]

The Clarification Act, in D.C.Code § 45–1631(b) (1990 Repl.), defines "sale" in a manner that unmistakably mirrored the Master Lease involved in this litigation which was then pending before the trial court, i.e., to "include" all agreements by which an owner relinquishes control of property, gives the party in control an option to purchase with interim payments to be applied to the purchase price; obligates the controlling party to pay taxes and insurance coverage; and allows the controlling party to purchase ownership interests in the property. At the specific request of counsel for appellants, the amendment provided that it would apply retroactively "to the sale of a rental housing accommodation" occurring after June 23, 1988. See Section 3 of 36 D.C.Reg. 5791 (1989) (slightly more than one month before the Master Lease was executed).[11]

the University agrees to purchase Seller's interest(s)....

\* \* \* \* \* \*

Any interests purchased by the University pursuant to this Paragraph 18(f) shall be held as a tenant in common, and no partnership or joint-venture relationship between the University and Landlord shall be created by any such purchase ...

\* \* \* \* \* \*

The University's counsel [will] receive[ ] oral clearance from an appropriate official of the District of Columbia Department of Consumer and Regulatory Affairs that such sales do not trigger any tenants' rights and may be made without violating said rights. (The University hereby represents to Landlord that the University's counsel has recently received an oral opinion from Mr. Byron Hallstead of the District of Columbia Department of Consumer and Regulatory Affairs that the sale contemplated by the paragraph 18(f) would not trigger any tenants' rights to purchase the Leased Premises under District of Columbia law and could be made without violating said rights). (Emphasis added).

10. On July 27, 1989, the District of Columbia Council enacted the Tenant Opportunity to Purchase Clarification Amendment Emergency Act

of 1989, 36 D.C.Reg. 5767–68 (1989), which became law immediately upon its enactment for a period of ninety days.

11. Counsel for Tenants testified before the Committee:

The effect of the bill as introduced is to clarify the term "sell" to include "any agreement that assigns, leases or encumbers property" and pursuant to which the owner meets six identified conditions. The term sell, as clarified, would unquestionably encompass the GWU Master Lease at the West End.

It is my position that the term "sell" pursuant to the Act as it was in effect as of the date of the Master Lease, August 1, 1988, already included this master lease agreement [sic] that is the basis of the tenants' claim in the litigation. Of course, it would be very helpful for the Council to clarify, through this bill, that it assumed all along that such an arrangement was covered by the Act.

I am very concerned, however, that if this bill is not made explicitly retroactive, the Court could conclude that at the time GWU entered into its master lease, a master lease was not a violation of the Act. This conclusion could be based on the assumption that legislation is prospective in effect unless it is made explicitly

On September 1, 1989, GWU and the Owners filed a motion for preliminary injunction to bar the District of Columbia from enforcing the Clarification Act with respect to the Lease Agreement. GWU and the Owners subsequently withdrew this motion on October 2, 1989, upon the representation by the District of Columbia that no criminal penalties would be pursued outside this litigation. The parties on the same date stipulated that the District of Columbia could file an amended complaint to include a count under the Housing Conversion and Sale Act of 1980, as amended, D.C.Code § 45–1601 *et seq.* as amended in turn by the "clarifying" amendments of 1989, and that the appellees could file a counterclaim to that count. Those pleadings were subsequently filed. In June, 1990, all parties filed summary judgment motions. The trial court granted summary judgment in favor of GWU and the Owners and denied the motions of the District of Columbia and the Tenants.

## II.

### 1. Standard of Review— Summary Judgment

■ In reviewing the trial court's grant of summary judgment, we consider the evidence in the light most favorable to the non-moving party, and make a *de novo* determination (1) whether any genuine issue of material fact exists, and (2) whether appellees are entitled to judgment as a matter of law. *Dodek v. CF 16 Corp.,* 537 A.2d 1086, 1092 (D.C.1988); *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983); *see* Super.Ct.Civ.R. 56(c) (1993). In doing so, we must conduct an independent review of the record, *Scrimgeour v. Magazine,* 429 A.2d 187, 188 (D.C.1981), to determine whether there are any material factual issues. *McCoy v. Quadrangle Dev. Corp.,* 470 A.2d 1256, 1259 (D.C. 1983). Where there is doubt as to whether a genuine issue of fact has been raised, summary judgment is precluded. *International*

*Underwriters, Inc. v. Boyle,* 365 A.2d 779, 782–83 (D.C.1976). However, summary judgment can not be avoided merely by demonstrating a disputed factual issue. *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Rather, the opposing party must show that the fact is material and "that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (citation and internal quotation omitted). Like the trial judge, we are satisfied that there are no genuine issues as to material facts. Thus, we are faced only with issues of law.

### 2. Sale Act of 1980

We first examine whether the Master Lease Agreement would constitute a sale under the terms of the Sale Act of 1980— absent consideration of the later Clarification Act of 1989. The Sale Act of 1980 "is the culmination of a long history of restrictions on conversion" of rental housing which have been enacted since 1974. *Hornstein v. Barry,* 560 A.2d 530, 532 (D.C.1989) (en banc). *See District of Columbia v. Washington Home Ownership Council, Inc.,* 415 A.2d 1349, 1360–64 (D.C.1980) (en banc); *Silverman v. Barry,* 269 U.S.App.D.C. 327, 330–32, 845 F.2d 1072, 1075–77, *cert. denied,* 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988). In enacting the Sale Act of 1980, the Council made several findings:

1. There exists a continuing housing crisis in this city, with a severe shortage of rental housing and a low vacancy rate, particularly in relation to units which lower income tenants can afford. *See* D.C.Code § 45–1601(2) (1990 Repl. & 1993 Supp.).

2. The conversion of rental units to condominiums or cooperatives depletes the rental housing stock. *See* D.C.Code § 45–1601(3) (1990 Repl. & 1993 Supp.).

retroactive and that there would be no need for legislation if the master lease violated the Act when it was executed. Therefore, it is critical that this Committee make explicit that the clarification of the term "sell" is retroactive, so that the GWU Master Lease is clearly covered by the bill.

Testimony of Richard C. Eisen, pp. 3–4, Committee on Consumer and Regulatory Affairs, Public Hearing on Bill 8–188, the "Tenant Opportunity to Purchase Clarification Amendment Act of 1989."

3. Lower income tenants are affected most severely for post-conversion costs are usually beyond their means, a condition which results in forced displacement, serious overcrowding, and disproportionately high housing costs. *See* D.C.Code § 45–1601(4) (1990 Repl. & 1993 Supp.).

4. Experience with prior conversion controls has demonstrated that such restrictions have not been sufficiently effective, and tenants who are most directly affected by conversion should be given a voice in the determination whether their rental housing should be converted. *See* D.C.Code § 45–1601(7) (1990 Repl. & 1993 Supp.).[12]

■ The Sale Act provides, in relevant part, that "[b]efore an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or notice to vacate, for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale." D.C.Code § 46–1631(a) (1990 Repl.).[13] Moreover, "[i]n addition to any and all other rights specified in this subchapter, a tenant or tenant organization shall also have the right of first refusal during the 15 days after the tenant or tenant organization has received from the owner a valid sales contract to purchase by a 3rd party." D.C.Code § 45–1637 (1990 Repl.).

Here, the trial court found that "the [Master] Lease [does not] violate the Sale Act.... Under the Lease, GWU is *not* obligated to

purchase the buildings; to the contrary, GWU has the option *not* to purchase as well."

### a. Construing the Sale Act

■ It is clear that "the starting point for interpreting a statute is the language of the statute itself," and that, "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Moreover, "if the words are clear and unambiguous, we must give effect to [the statute's] plain meaning," *James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989) (citations omitted), keeping in mind that the intent of the legislature is to be found in the language which it has used, *id.* at 46 (citing *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897)); *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C. 1983) (en banc), and words should be construed according to the meaning commonly attributed to them. *United States v. Thompson,* 347 A.2d 581, 583 (D.C.1975). In sum, "'[t]he words used, even in their literal sense, are the primary and ordinarily the most reliable source of interpreting the meaning of any writing.'" *Parreco, supra,* 567 A.2d at 46 (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)).[14]

12. In the Rental Housing and Sale Act of 1980 Amendments and Extension Act of 1983 (the "Extension Act"), in effect when the Master Lease was signed, the Council made similar findings.

13. Both tenant and owner are expected to bargain in "good faith." While no definition of "good faith" is offered, its absence is evident where: (1) the owner fails to present the tenant with a price or term as favorable as that offered to a third party; (2) the owner fails to contract with the tenant on the same price/terms within a reasonable time period; (3) the owner or tenant intentionally fails to comply with the statute. *See* D.C.Code § 45–1634(a)(1)–(3) (1990 Repl.). *See Columbia Plaza Tenants Ass'n, Inc. v. Antonelli,* 462 A.2d 433, 437 (D.C.1983) ("Although this

statute is in derogation of the common law and therefore must be strictly construed, good faith on the part of the Owners must be deemed to be implied lest the statute become illusory").

14. In addition, we must inquire whether our interpretation is "plainly at variance with the policy of the legislation as a whole" requiring that we remain faithful more to the purpose than the word. *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (internal quotation and footnote omitted). *See United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 380–81, 92 L.Ed. 442 (1948) (courts do not wallow in literalism where the plain language of a statute would lead to absurd consequences which the legislature could not have intended).

In *Parreco, supra,* 567 A.2d at 45, landlord petitioner sought to overturn the Rental Housing Commission's ruling that "equity" and "interest payments" refer only to "those mortgages or encumbrances of which the proceeds have been reinvested in the housing accommodation." In finding in favor of landlord, we applied the plain language of the statute,[15] noting both the rent stabilization program's need "[t]o protect low and moderate income tenants from the erosion of their incomes from increased housing costs[,]" D.C.Code § 45–1502(1) (1986 Repl.), and the "sometimes competing goal ... to provide landlords and developers with a reasonable rate of return on their investments." *Parreco, supra,* 567 A.2d at 44 (citation and internal quotation omitted).

Similarly, the tenant-appellant in *Gibson v. Johnson,* 492 A.2d 574 (D.C.1985), maintained that a father who transferred title in a rental building to his son was still the "owner" of the premises under the Rental Housing Act's rent-control provisions, arguing that "given a liberal definition of the term, [appellee] should not be able to evade rent control provisions by conveying the property to one who qualifies for the exemption." *Id.* at 577 (footnote omitted). Acknowledging that "[t]his court, of course, will not look beyond the plain meaning of a statute when the language is unambiguous and does not produce an absurd result," *id.* (citation omitted), we held that

> [a]n examination of the record reveals that [appellee] may have had as one motive in conveying the property to his son the evasion of rent control. And as appellant suggests, this result may not have been desired. Yet, the statute is not ambiguous. It clearly exempts from rent control rental

housing of four units or less which is *owned* by not more than four persons provided the owner(s) has no interest, either directly or indirectly, in any other rental property in the District of Columbia and provided a claim of exemption statement is properly filed with the Rental Accommodations Office. In our view, these criteria have been satisfied.

*Id.* (internal footnotes omitted).

■ The rationale underlying our decision in *Gibson* is persuasive here.[16] Although at the time the Master Lease was entered into the Council failed to define the word "sale," [17] as a leading commentator states, "[w]here the legislature has not defined words used in the act, the court must then determine the meaning of the language in accordance with the legislative intent and common understanding to prevent absurdities and to advance justice." 1A NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 20.08 (5th ed. 1993). Moreover, "[i]f a word that should be defined in a statute is not, then its commonly accepted meaning is applied...." 2A SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.07 (5th ed. 1992). The use of dictionary definitions is appropriate in interpreting undefined statutory terms. *Id.*

■ There appears to be an almost universal consensus that, in the context of real property transactions, the word "sale" signifies an absolute transfer of property. BLACK'S LAW DICTIONARY 1337 (6th ed. 1990) defines sale, *inter alia,* as

> A contract whereby property is transferred from one person to another for a consideration of value, implying the passing of the *general and absolute title, as*

---

**15.** The term "interest payment" is defined in D.C.Code § 45–1503(11) (1981) as "the amount of interest paid during a reporting period on a mortgage or deed of trust on a housing accommodation." The term "equity" is defined in D.C.Code § 45–1503(7) (1981) as "the portion of the assessed value of a housing accommodation that exceeds the total value of all encumbrances on the housing accommodation."

**16.** Appellants stress that D.C.Code § 45–1661 provides that "[t]he purposes of this chapter favor resolution of ambiguity by the hearing officer

or a court toward the end of strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law." As we find no ambiguity, this provision does not come into play.

**17.** *Cf.* 14 DCMR § 4711.8 (1991) which provides that "[u]nder Title IV of the Act, the terms 'sale' or 'sell' include the exchange or trade of properties, but shall include the transfer of title through a will or intestate succession and the transfer of property without consideration between husband and wife or from parent to child."

*distinguished from a special interest falling short of complete ownership.*

(emphasis supplied). "An option contract and a contract of sale are in fact two separate and distinct contracts, namely, an option contract, and the agreement to sell. An option, originally, is neither a sale nor an agreement to sell." 77 AM.JUR.2D. *Vendor and Purchaser* § 28 (1975) (footnotes omitted); *see also* 91 C.J.S. *Vendor and Purchaser* § 5 (1955).[18]

■ Here, by the terms of the Master Lease, (1) GWU must pay a monthly rental for a ten-year period, after which it must vacate the premises (unless it purchases); (2) GWU is restricted from leasing any units for a term running past the expiration date of the Master Lease; (3) GWU must have approval of the Owners prior to commencing with any alterations or renovations; (4) GWU may not assign its rights without the Owners' consent; and (5) the Owners reserve the right to reenter the premises in the event of noncompliance with the lease provisions. The Owners retain record title to the premises.

It is true that the lease affords GWU a large measure of control over the premises, including control over equipment, supplies and transferable permits but obligates GWU to pay for such permits. It also obligates GWU to pay real property tax and insurance premiums as well as expenses for utilities and maintenance. But such allocations of rights and obligations are common in a so-called "triple-net lease," a standard arrangement employed in connection with the use of real property by tenants who are not in any sense purchasers of the real property from which they operate their business.[19] GWU's

answers to interrogatories stated, without contradiction, that the lease agreement in question "is a standard triple-net lease which in this metropolitan area is a standard commercial lease dictated by the marketplace." [20]

In light of the foregoing considerations, it is clear that the Owners have not conveyed their entire interest and title in the West End and, applying the above definitions, we conclude that the Master Lease does not effect the absolute transfer of the West End to GWU and, accordingly, is not a sale under the Sale Act as it was enacted in 1980.

■ The Master Lease is not transformed into a sale by virtue of the included option to purchase. An option to purchase is a contract whereby a property owner, in exchange for valuable consideration, agrees with another person that the latter shall have the privilege of buying property within a specific time on terms and conditions expressed in the option. 1 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 5:16 (4th ed. 1990).

The commentators clearly distinguish an option from a sale. *See* 8A GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 4443, at 257 (1963 Repl.) ("The option is not a sale. It is not even an agreement for a sale. At best, it is but a right of election in the party securing the same to exercise a privilege, and only when that privilege has been exercised by acceptance does it become a contract to sell"); BLACK'S LAW DICTIONARY 1094 (6th ed. 1990) ("An option to purchase ... is not a contract to purchase ..., as optionee has the right to accept or to reject the offer, in accordance with its terms, and is not bound").[21]

---

**18.** In this case, the option was more limited than most, in that it was not a continuing offer to sell until a time certain, but an offer to sell at the end of a ten-year period.

**19.** The term "triple-net" is used to refer to leases pursuant to which the rent paid to the landlord is, as here, net of property taxes, net of insurance, and net of expenses for utilities and maintenance. *See, e.g., Doctors Bldg. Partners v. Grimes Bridge Assocs.*, 199 Ga.App. 216, 404 S.E.2d 582, 583 (1991).

**20.** It is, of course, true that the Master Lease Agreement contained not only typical triple-net

lease terms but also GWU's option to purchase and the Owners' option to sell a minority interest under specified conditions.

**21.** Relevant case law recognizes the distinction. In *Dodek, supra,* 537 A.2d at 1095, appellant argued that "because [a contract for the purchase of real property] did not obligate the purchasers to pay the full purchase price unless they elected to go to settlement, the contract should be treated as an option contract," and not as a sales contract. In agreeing with appellant, we adopted the holding in *Green Manor Corp. v. Tomares,* 266 Md. 472, 295 A.2d 212 (1972), where the Maryland Court of Appeals concluded

Notwithstanding the clarity of the statutory language and the Master Lease, appellants argue that we should adopt the rationale of certain courts of other jurisdictions in the few decisions which have construed an option contract to trigger the refusal rights of tenants. In particular, appellants cite *Quigley v. Capolongo*, 53 A.D.2d 714, 383 N.Y.S.2d 935 (1976), *aff'd sub nom.*, *Quigley v. Ithaca College*, 43 N.Y.2d 748, 401 N.Y.S.2d 1009, 372 N.E.2d 797 (1977) for the proposition that, despite the denomination given by the parties, an option to purchase is a "sale" and triggers tenants' rights to purchase. We disagree.

In *Quigley*, Ithaca College entered into a contract to purchase a certain property. Upon discovering that a third party had a previous right of first refusal in the same property, the college withdrew from the contract. The college then entered into a lease with an option to purchase which was to run until after the third party's right of first refusal expired. For this option, the college paid over 20% of the ultimate purchase price at the outset and a "rental of only $1,000 annually, clearly a nominal sum for a lease of nine acres." *Quigley, supra*, 383 N.Y.S.2d at 937. After observing that "it is inconceivable that the college would pay such a large sum in relation to the total purchase price if the parties did not contemplate from the outset that a purchase would be consummated," *id.*, the court concluded "that in the circumstances of this case it formalized defendant-owners' intention to sell the premises in response to the offer by defendant Ithaca College, thus activating plaintiffs' right of first refusal." *Id.*

Although superficially similar, *Quigley* is essentially inapposite to the instant action. Whereas *Quigley* was concerned with a contractual first right of refusal which the parties could circumvent by waiting until it expired, the tenants' right of refusal here is statutorily based and explicitly recognized by the Master Lease as applicable in the event that GWU should opt to exercise its option to purchase. Moreover, unlike the arrangement in *Quigley*, GWU pays the Owners $300,000 yearly, $200,000 of which is denominated as rental payments while the additional $100,000 pays for the option. The net purchase price at the end of the ten-year term if the option is exercised is $5 million.[22]

---

that a contract which "give[s] the purchaser the option and privilege to choose between consummating the purchase on the agreed upon terms or of walking away, for any reason or no reason, with no obligation or liability whatever save the loss of his [or her] deposit[,]" is an option, and not a purchase-and-sale agreement. *Id.* 295 A.2d at 214 (internal quotations omitted). *See also Biggins v. Shore*, 365 Pa.Super. 237, 529 A.2d 487 (1987), *aff'd*, 523 Pa. 148, 565 A.2d 737 (1989) (an option is an offer which, *when accepted*, is a valid and binding contract); *Fried v. Barad*, 175 Ill.App.3d 382, 125 Ill.Dec. 175, 181, 530 N.E.2d 93, 99 (1988) ("an option is not a sale or a contract of sale and conveys no legal title.... *Before acceptance, an optionee has no land or interest in land*") (citations omitted) (emphasis supplied); *Estate of Saemann v. Tucker Realty*, 529 N.E.2d 126, 129 (Ind.Ct.App.1988) ("An option to purchase is not a sale or an agreement to sell, but merely a right of election to exercise a privilege. *It becomes a contract to sell only upon its exercise*") (emphasis supplied) (citing *Coons v. Baird*, 148 Ind.App. 250, 265 N.E.2d 727, 731 (1970)); *Pollard v. City of Bozeman*, 228 Mont. 176, 741 P.2d 776, 779 (1987) ("An option to buy involves a contract wherein the owner agreed to give another the exclusive right to buy property at a fixed price within a specified time.[] The option is not a sale. It is not even an agreement for a sale. At best, it is

but 'a right of election in the party securing the same to exercise a privilege,' and *only when that privilege has been exercised by acceptance does it become a contract to sell*") (emphasis supplied) (citation omitted); *Tate v. Wood*, 169 W.Va. 584, 289 S.E.2d 432, 434 (1982) ("An option to purchase is not a sale nor an agreement to sell: it becomes an executory contract *only when properly accepted within the stipulated time*") (emphasis supplied); *Hueschen v. Stalie*, 98 N.M. 696, 652 P.2d 246, 248 (1982) ("A lease with an option to purchase real estate creates no estate in the lessee beyond his leasehold interest"); *Detwiler v. Capone*, 357 Pa. 495, 55 A.2d 380 (1947) (when a lessee of real property exercises an option to purchase contained in the lease, it is then that the landlord and tenant relationship between the parties ceases to exist and the lease is converted into a contract of sale); *Ottman v. Albert Co.*, 327 Pa. 49, 192 A. 897, 899–900 (1937) (lease, not sale occurs when use and possession pass, but not title).

**22.** We find hollow the District's argument that there is something suspicious about the lease provision in paragraph 18, see note 9, *supra*, which states that the terms of the lease will be automatically extended and closing on the sale will not occur until ninety days after the expiration of any tenants' right to purchase. Such a provision was obviously necessary in order to afford tenants their statutory first right of refusal.

Appellant has not suggested, nor do we conclude, that either the rental payments or the final asking price are "nominal" or fail to comport with fair-market value.[23]

Ten years after *Quigley*, the Supreme Court of New York, Appellate Division, held that where the language of the first refusal agreement stated that "[l]andlord agrees to give 'first refusal' *on sale*," a net lease with an option to purchase was "not a conveyance amounting to a 'sale' of property so as to activate plaintiff's right of first refusal, absent a showing that the net lease was a 'sham' or otherwise entered into in bad faith for the purpose of defeating plaintiff's rights." *Kings Antiques Corp. v. Varsity Properties, Inc.*, 121 A.D.2d 885, 503 N.Y.S.2d 575, 576–77 (1986) (emphasis supplied) (citing *Quigley, supra*).[24] The court there held:

> The option contained in the net lease does not violate plaintiff's preemptive right. The right of first refusal on sale does not mature until such time as the net lessees exercise their option to pur-

chase.... Since the plaintiff's lease particularly specified a right of first refusal on sale, the grant of a mere option does not violate the plaintiff's right.

*Id.* 503 N.Y.S.2d at 577 (citation and internal quotation omitted).[25] We are satisfied that the clear import of the Sale Act as it was enacted in 1980 is that the option to purchase in the Master Lease did not trigger Tenants' right of first refusal, and that the trial court was correct in so ruling.

## 3. Clarification Act

Having established that the plain meaning of the Sale Act of 1980 does not bring the Master Lease within its reach, we must next examine whether the same result still obtains in light of a subsequent "clearly expressed legislative intention to the contrary." *Consumer Product Safety Comm'n, supra*, 447 U.S. at 108, 100 S.Ct. at 2056. Nowhere in the extensive legislative history of the Sale Act *prior to* its consideration of the Clarification Act did the Council suggest that enter-

**23.** The other cases relied on by Tenants are easily distinguished, and do not support a result different from that reached here. *See, e.g., E–Z Livin' Mobile Sales, Inc. v. Van Zanen*, 26 Ariz. App. 363, 548 P.2d 1175, 1177 (1976) (where the appellees (1) had originally desired to purchase a house trailer and lot from appellant, (2) paid a substantial "down payment," (2) made smaller payments for ten years, and (3) were given the "option to purchase" the trailer and lot for the *de minimis* final payment of $10 ("an amount that is not indicative of the value of the property"), the Arizona Court of Appeals found an installment sale which was void as "a clear attempt to subvert the public policy against forfeitures"); *Aldrich v. Forbes*, 237 Or. 559, 391 P.2d 748, 750 (1964) (en banc) (In distinguishing a sale from a lease, the court held that "if the condition that the purchaser secure necessary financing is interpreted as leaving performance optional with the purchaser, a contract for the sale of the land does not arise. But if the agreement is interpreted to mean that the purchaser is obligated to make a reasonable effort to obtain financing that provision is not a condition precedent to the creation of a contract to purchase") (citations omitted); *Marine Midland Trust Co. v. Village of Waverly*, 42 Misc.2d 704, 248 N.Y.S.2d 729, 731 (N.Y.Sup.Ct.1963) (where instrument contained parcels to be "leased" for a period of twenty years with an option to purchase for $1.00, the court held that "[t]he inescapable conclusion reached is that the consideration of $1.00 stated therein is no reflection of the reasonable value of

the property.... This entire arrangement was nothing more than a means of financing the purchase of the premises by paying monthly instalments [sic] for twenty years"), *aff'd*, 21 A.D.2d 753, 251 N.Y.S.2d 937 (1964); *Bolling v. Hawthorne Coal & Coke Co.*, 197 Va. 554, 90 S.E.2d 159, 168 (1955) (instruments of conveyance, pursuant to which appellee paid $24,000 in cash at the time of execution; expended more than $60,000 on permanent structures and fixtures; and agreed to pay twice the fair-market rental of the premises, "show[s] a studied attempt to give the transaction the form and appearance of a lease; but the obvious purpose and the natural effect were to consummate a contract of conditional sale").

**24.** *Cf. Hasty v. Health Serv. Centers, Inc.*, 258 Ga. 625, 373 S.E.2d 356, 358 (1988), where a first-refusal agreement providing that lessor must be given notice *"prior* to any sale," "require[d] a conclusion that the preemptive right of first refusal was triggered by the granting of the option."

**25.** *Accord K.C.S., Ltd. v. East Main St. Land Dev. Corp.*, 40 Md.App. 196, 388 A.2d 181 (1978), where the court held that a transfer of corporate stock from a seller to a buyer did not trigger the "right of first refusal" as "[t]enant still possesse[d] all the rights and privileges conferred on it by the lease, including the 'right of first refusal' to purchase the property demised to the Tenant." *Id.* 388 A.2d at 183.

ing into an arrangement such as the Master Lease would trigger a tenant's right of first refusal. Nonetheless, in the Report of the Committee on Consumer and Regulatory Affairs regarding the Clarification Act, the Committee stated that Bill 8–188 merely clarifies the original intention of the Council when it passed the Rental Housing Conversion and Sale Act of 1980. Accordingly, the report states that "the Committee feels that the use of any agreement which transfers rights that are associated with ownership would make *any* transfer of tenant-occupied property subject to review. *And the Council is only seeking to clarify its original intent.*" COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, REPORT ON THE TENANT OPPORTUNITY TO PURCHASE CLARIFICATION AMENDMENT ACT OF 1989, at 7 (1989) (emphasis supplied). As explained above in Part I, section 3, of this opinion, the Act went on to redefine the term "sale" in a manner that plainly mirrored the terms of the Master Lease involved in this case. We must now consider what weight to give to this retroactive expression of intent, an expression set forth not merely in the legislative history of the Clarification Act, but in the statutory language itself.

▮▮▮▮▮ "Subsequent legislation which declares the intent of an earlier law is not, of course, conclusive in determining what the previous Congress meant." *Federal Hous. Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958). However, "the later law is entitled to weight when it comes to the problem of construction." *Id.*[26] *See also United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960) ("the views of a subsequent Congress form a hazardous basis for

inferring the intent of an earlier one"); *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 839, 108 S.Ct. 2182, 2190–91, 100 L.Ed.2d 836 (1988) (opinion of "later Congress as to the meaning of a law enacted 10 years earlier does not control the issue"); *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 200 n. 7, 98 S.Ct. 444, 449 n. 7, 54 L.Ed.2d 402 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history"); *Bridgestone/Firestone, Inc. v. Pension Benefit Guaranty Corp.,* 282 U.S.App.D.C. 89, 94 n. 5, 892 F.2d 105, 110 n. 5 (1989) ("[T]he pronouncements of a subsequent Congress, here 13 years after the passage of ERISA, are notoriously unreliable indicators of the intent of Congress at the time of passage, and we give very little weight to such revisionist legislative history"). We deem not to the contrary *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), where the Supreme Court upheld Congressional legislation which codified a thirty-year agency interpretation of the statutory term "public interest." There, the Court spoke of the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Id.* at 381, 89 S.Ct. at 1802. Here, however, the Clarification Act's retroactive definition of the word "sale" is at variance with both the common usage of the term "sale" and the understanding of the meaning of the Sale Act of those charged with its administration. Accordingly, the retroactive interpretation in question here does not deserve the same deferential treatment accorded in *Red Lion.*

---

**26.** In his concurring opinion in *Winters v. Ridley,* 596 A.2d 569 (D.C.1991) (there was no opinion for the court), Judge Ferren expressed for himself a guarded view of the value of a legislative resolution adopted three years after the enactment of a statute and declaring the intent with which the legislature had enacted that statute. He wrote:

I believe a post-enactment declaration of legislative intent, clearly intended to affect pending litigation, is inherently suspect. Even if the declaration truly reflects earlier legislative intent, (which may or may not reflect the intent of the Mayor in signing, and the Congress in not vetoing the legislation), it appears to be

intended to affect judicial review.... It is not difficult, however, to imagine that a legislative body on some other occasion—confronted by a public outcry against a trial court decision interpreting ambiguous legislation to create a very unpopular right—could conveniently, and retroactively, find an intent that had never been thought of, let alone declared, at the time of enactment....

*Id.* at 580.

As we explained above, the Clarification Act was adopted in 1989 to affect litigation brought by the District in 1988 by "clarifying" legislation enacted in 1980.

Moreover, it is appropriate to take note of the views of the Director of the Department of Consumer and Regulatory Affairs ("DCRA"), the agency charged with enforcing the Sale Act, who testified concerning the Clarification Act that:

This proposed legislation would define certain transactions as sales for the purpose of the Rental Housing and Conversion and Sale Act. These transactions, involving leases and purchase options, transfer many of the benefits of ownership but *are currently not defined as sales and therefore do not trigger the tenants' opportunity to purchase provisions of the Conversion and Sale Act. If passed, the amendment would expand the current definition of "sale" to include....* [specifying features of lease which would make it a "sale"].

Executive testimony of Donald G. Murray before the Committee on Consumer and Regulatory Affairs, April 27, 1989 (emphasis supplied).[27] We have already concluded that the Sale Act, as it read before the adoption of the Clarification Act, simply did not apply to an agreement such as the Master Lease.

It is also entirely clear from our discussion above of the Bond Act that, so long as the Master Lease did not trigger the Sale Act of 1980, the conduct of GWU was consistent with the assurances the university had given in connection with the enactment of the Bond Act.[28] For the reasons we have stated in this section, we find unavailing the retroactive indication of legislative intent expressed in the Clarification Act with respect to the meaning of the term "sale." At the time the Master Lease was entered into by appellees, it did not constitute a sale. Thus, appellants can prevail here only if the Clarification Act had the effect of retroactively changing the definition of the term "sale" so as to convert the 1988 Master Lease from a lease into a sale. We turn therefore to consider the retroactive effect, if any, of the Clarification Act upon the Master Lease, consideration which implicates the Contracts Clause of the United States Constitution.

## III.

### Contracts Clause

As we have seen, the Clarification Act undertook to define, retroactively, the meaning of the word "sale" in such fashion as to make the Master Lease in this case a sale rather than a lease. The trial court ruled that, as applied to the Master Lease, the Clarification Act violated the Contracts Clause of the United States Constitution.

Article I, Section 10, Clause 1 of the Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. CONST. art. I, § 10, cl. 1.[29] Despite its absolute language,

---

27. Similarly, on September 20, 1988, in his statement before the Roundtable of the Council, Mr. Murray said:

[I]t is clear that the transfer of interests pursuant to a lease does not give rise to the tenants' opportunity to purchase.... The inclusion in the lease agreement of a future option to purchase is also not sufficient to require that the owner make an offer to the tenant at this time. The mere creation of a future option to purchase is not a sale. The opportunity to purchase must be given at some time prior to the exercise of the option, not at the time the option is negotiated.

These views are similar to those expressed by Mr. Hallstead of the same Department. See page 6, *supra*.

28. We are persuaded, in any event, that GWU adhered to all the specific requirements of the agreement GWU made prior to adoption of the Bond Act. The District's brief, in support of its argument that GWU violated its 1981 agreement, makes brief mention of the feature of the Master Lease Agreement (paragraph 18(f)) that gave the owners the right to require GWU to purchase a minority ownership interest of up to 49% in the property in question under certain conditions. The District acknowledges that the provision was never triggered because none of the individual Bradford-group owners chose to compel purchase. More to the point, the District acknowledges that this contract provision could not be used by owners if it triggered such rights, i.e., was a sale. In our view, this conditional option to require purchase of a minority interest did not make the underlying agreement a sale, and did not violate the Bond Act.

29. D.C.Code § 1–204 (1990 Repl.) provides, in part:

[T]he legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this Act subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

the Clause does not act as a complete bar to legislative alterations of existing contractual obligations because "its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934)).

■ The Supreme Court has outlined the scope of the Clause and proposed a three-part inquiry to guide in its interpretation. Parties seeking relief must demonstrate (1) that there has been a substantial impairment of a contractual relationship; (2) that the impairment is not justified by a "significant and legitimate public purpose;" or if so justified, (3) that the impairment is not based upon reasonable conditions or "'of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves, supra,* 459 U.S. at 411–12, 103 S.Ct. at 705 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22 (1977)).

■ Accordingly, appellees must initially demonstrate that the 1989 Act substantially impairs the Master Lease Agreement between them. To demonstrate such an impairment, a contracting party need not prove a complete cancellation of his rights. Rather, it is the degree of contractual interference which becomes critically significant. *United States Trust Co., supra,* 431 U.S. at 27, 97 S.Ct. at 1520. Whereas "[m]inimal alteration of contractual obligations may end the inquiry at its first stage[,] [s]evere impairment, on the other hand, will push the inquiry to a careful examination of the nature and pur-

pose of the state legislation." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978).

In measuring an impairment's substantiality, the Supreme Court has accorded significance to whether the state has restricted contracting parties "to gains [they] reasonably expect[ ] from the contract." *Energy Reserves, supra,* 459 U.S. at 411, 103 S.Ct. at 704. Here, by making the 1989 Act retroactive, the Council modified the law in such fashion that appellees' actions in entering into the Master Lease without offering the tenants a first right of refusal, would be transformed into a violation of the Sale Act. Not only did this legislation expose appellees to a fine not to exceed $50,000 for willful violation, D.C.Code § 45–1660 (1990 Repl.), but it effectively deprived the Owners of a contract yielding $300,000 annually, and might deny GWU whatever potential benefit might have accrued from the agreement. Indeed, the District of Columbia and Tenants contend that the entry by the contracting parties into the lease, as distinguished from the university's eventual exercise of its right to purchase, brought about the immediate requirement that the property be offered to Tenants for purchase, or for the exercise of a right of first refusal.[30] It is obvious that the parties to the contract did not contemplate that the Sale Act might be triggered by their merely entering into the lease.

As a measure of contractual expectations, one factor to be considered in determining the extent of the impairment is "whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves, supra,* 459 U.S. at 411, 103 S.Ct. at 704; *see Veix v. Sixth Ward Bldg. & Loan*

30. In light of our holding that "if the [tenants] right to purchase under the [Sale] Act is to have any meaning, the third party contract must be very close, in its terms and substance, to that which the sellers are willing to accept from the [tenants]," *Columbia Plaza Tenants Ass'n, supra* note 13, 462 A.2d at 438, it is curious that the Tenants should argue that they should be permitted to *purchase* rather than *lease* the West End under the same terms and with similar responsibilities as those accorded GWU. A court ruling that Tenants are entitled to enter a Master Lease with substantially the same terms as those accorded GWU, which appears to be essentially

what tenants can reasonably seek under the Sale Act, might well be a meaningless victory for Tenants. The ruling would give Tenants the right to lease under substantially the same terms as GWU and then to consider whether to exercise their option to purchase after the ten-year period of the lease had expired. Presumably, if the owners exercised their option under paragraph 18(f) of the Master Lease, see note 9, *supra,* to require the lessee to purchase up to a 49% ownership interest in the property, Tenants would be required to purchase it. The passage of time may have mooted this second aspect of the Master Lease.

*Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940). The Court in *Veix, supra,* 310 U.S. at 38, 60 S.Ct. at 794–95, held that "[w]hen [a party] purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic." The history of the Rental Housing Act and the Sale Act indicates that rights of first refusal have long been accorded tenants under certain circumstances. Such rights have arisen, however, in connection with sales (or demolition or discontinuance of housing use) rather than with leases with or without options to purchase. It is significant that the language quoted from *Veix* refers to an enterprise already regulated in *the particular* which is now being regulated on the same topic (in *Veix,* the requirements for withdrawal of shares in a building and loan association). We must consider whether the extension of rights of refusal from sales to leases should be viewed as an extension to a new "particular" or "topic" which the parties would not reasonably be expected to anticipate.

In *Allied Structural Steel, supra,* 438 U.S. at 250, 98 S.Ct. at 2725, the Supreme Court held that a Minnesota statute retroactively requiring certain employers to increase substantially their contributions to private pension plans "did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State." The unregulated area was the administration of pension plans. Although the State had previously engaged in regulating other aspects of employee compensation, such as wages and disability benefits, the Court held that the Minnesota Legislature had "[e]nter[ed] a field it had never before sought to regulate" with its pension statute. *Id.* at 249, 98 S.Ct. at 2725. The "field" was therefore defined, not as the broad area of employee compensation, but as the more restricted subject of pension plans.

Conversely, in *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Court found no substantial impairment resulting from Kansas' imposition of certain price controls on natural gas in light of the state's already "extensive and intrusive" supervision of the industry, *id.* at 414, 103 S.Ct. at 706, noting that Kansas "in the past has regulated the wellhead price of natural gas." *Id.* at 413 n. 17, 103 S.Ct. at 706 n. 17 (citation omitted). The Court attached significance to the fact that the price escalator clauses at issue were designed to guarantee price increases consistent with anticipated increases in the value of the seller's gas, and to the fact that the parties' anticipations contemplated regulated rather than deregulated prices. The Court also stated that the contracts could be interpreted to contemplate *state* regulation.

From the holdings in *Energy Reserves* and *Allied Structural Steel,* we are instructed that, to preclude a subsequent finding of substantial impairment, earlier regulation must share more with the challenged legislation than simply the identity of the broad industry in which it operates, or even a broad phase of that industry's activity. While the Court in *Energy Reserves* confronted a regulation within a particular industry that shared a primary feature, control of price, of legislation enacted by the state and previously enacted by the federal government,[31] in contrast it dealt in *Allied Structural Steel* with legislation on a specific topic never before reached by state regulation.

Applying these authorities to this case, we note that although the Council had repeatedly acted in the broad area of tenants' rights, and had created a right of first refusal when there was a contract to sell the property, there had never been any move prior to the Clarification Act to include leases with options to purchase within the term "sale." To return to the question posed in *Veix, supra,* 310 U.S. at 38, 60 S.Ct. at 794–95, whether a party purchased into an enterprise already regulated in the "particular" or "topic" which the party now objects, we acknowledge that previous legislation in the District has enhanced tenants' opportunities to purchase or to exercise rights of first refusal regarding

---

**31.** "Price regulation existed and was foreseeable as the type of law that would alter contract obligations." *Energy Reserves, supra,* 459 U.S. at 416, 103 S.Ct. at 707.

rental property that is to be sold, demolished, or taken off the market. But the legislation reaches into a new "particular" or "topic" when it undertakes to give such rights when the contracting parties have only entered into a lease of the type involved here. In entering the contract the parties obviously did not contemplate this departure, nor would it be fair to say that they should have anticipated it. Thus, although reasonable arguments may be made for the opposite view, on balance we deem this case to be more analogous to *Allied Structural Steel* than to *Energy Reserves.*

Based on the foregoing, and considering especially the extent to which the Clarification Act could negate the parties' reasonable expectations of the contract, we are satisfied that the Clarification Act *does* substantially impair appellees' contractual arrangement. Accordingly, for appellants to prevail, the 1989 Act must be shown to be justified by a significant and legitimate public purpose "such as the remedying of a broad and general social or economic problem." *Energy Reserves, supra,* 459 U.S. at 411–12, 103 S.Ct. at 704 (citations omitted). In analyzing the legitimate public purpose of a legislative act, "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear.... Severe impairment ... will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel, supra,* 438 U.S. at 245, 98 S.Ct. at 2723.

In determining the significance and legitimacy of a public purpose, our initial inquiry is whether "the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves, supra,* 459 U.S. at 412, 103 S.Ct. at 705.[32] For example, in *Troy, Ltd. v. Renna,* 727 F.2d 287 (3d Cir.1984), the Third Circuit upheld legislation which extended the residential leases of elderly citizens for the "broad remedial purpose [of] protecting the mental and physical health of citizens who could suffer greatly by evictions. The legislative findings expressly report[ed] that the relocation of elderly and disabled persons is disruptive, costly for themselves and for the state in general, and particularly injurious for these persons who are often limited to fixed incomes." *Id.* at 298.

Here, there was no such broad purpose. It is evident that the sole thrust behind the Clarification Act was to reach the Master Lease Agreement between GWU and the Owners.[33] It is equally evident that prior to the Clarification Act, (1) there had been no ruling by the Rental Housing Commission [("RHC")] on any matter "where the facts led one to believe that leases or informal or formal ownership agreements have been used to transfer ownership/control of a building to circumvent the tenants' right of refusal in a manner comparable to the facts surrounding the GWU/West End lease;"[34] (2) there had been no complaints before the RHC whereby "colleges or universities have

**32.** "Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned." *Home Bldg. & Loan, supra,* 290 U.S. at 447–48, 54 S.Ct. at 243.

**33.** A meeting with representatives of the Tenants and the Owners

led the Committee to begin an investigation of the agreement between the owners and the university, and a public roundtable on this matter was held September 20, 1988. During the September 20th roundtable, the Committee attempted to ascertain whether the lease agreement violated the tenant purchase provisions of the [Sale Act]. Questions were asked about whether tenants presently could elect to purchase their apartments if the owners chose to sell the building. While no definitive response was provided by the GWU, all responses indicated that tenants could not elect to purchase

their apartments until the master lease agreement expired.
   *Based upon the above information* and other information received as a result of the roundtable, Councilmember Ray introduced Bill 8–188, the "Tenant Opportunity to Purchase Clarification Amendment Act of 1989", to clarify the original intent of the act and *to ensure that this type of arrangement* is covered by section 401 of the Rental Housing Conversion and Sale Act of 1980.
COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, REPORT ON BILL 8–188, TENANT OPPORTUNITY TO PURCHASE CLARIFICATION ACT OF 1989, at 4 (1989) (emphasis supplied).

**34.** November 30, 1988 letter from Donald G. Murray, DCRA Director, in response to Councilmember Ray's October 25, 1988 inquiry regarding the George Washington University/West End Apartments.

attempted to circumvent the Rental Housing Act by leasing units to students only;" and (3) the DCRA has "received no complaints from tenants or tenant organizations about the use of master lease agreements."[35]

Addressing as it does a situation of "first impression," the Clarification Act appears in spirit, in language,[36] and in its explicit retroactive application to be directed only to the benefit of the "special interests" of the West End tenants, rather than to any broad societal interests. Accordingly, we agree with the trial court's conclusion that the Clarification Act serves no broad public purpose and, as applied to the Master Lease, is unconstitutional as violative of the Contracts Clause.[37]

Accordingly, the trial court's entry of summary judgment in favor of appellees GWU and the Owners is hereby affirmed.

*So ordered.*

---

35. *Id.* This is not to imply that it was at all inappropriate for tenants to take their complaints to the Council, but only to underscore that the Rental Housing Commission had encountered no complaints concerning type of agreement involved here.

36. The trial court found, and we agree, that "the Act define[s] a sale to include the *very* provisions included in the lease entered into between GWU and the Bradfords."

37. *Kraebel v. Department of Hous. Preservation and Dev.*, 959 F.2d 395 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992), is not to the contrary. The Second Circuit there rejected a New York City landlord's Contract Clause challenge to a provision of law affording additional rent control benefits to senior citizens, for which the landlord was to be compensated eventually by a tax abatement or a cash repayment that would be obtained through administrative procedures. In doing so, the Second Circuit panel held that the landlord could not claim surprise at this additional feature of New York City's already heavy regulation of residential rental property (which included regulation in the particular involved, rent control), and that the impairment was not in fact substantial because the city eventually reimburses the landlord to the extent the regulations reduce rent payments. The court also noted the presence of the legitimate public purpose of protecting senior citizens from rent increases. The Contracts Clause violation claim in this case is stronger than Kraebel's with respect to both the nature of previous governmental regulations and the degree of impairment of the agreement of the parties.