**COLUMBIA PLAZA TENANTS'
ASSOCIATION, Appellant,**

v.

**COLUMBIA PLAZA LIMITED
PARTNERSHIP, et al.,
Appellees.**

No. 03–CV–1296.

District of Columbia Court of Appeals.

Argued Jan. 14, 2005.

Decided Feb. 17, 2005.

Elizabeth Figueroa, Washington, DC, for appellant.

Eric Von Salzen, Washington, DC, with whom Marta I. Tanenhaus, was on the brief, for appellees Columbia Plaza Limited Partnership and CP Real Estate, LLC.

Vincent Mark J. Policy, Washington, DC, with whom M. Ryan Jenness, was on the brief, for appellee George Washington University.

J. Michael Hannon, Washington, DC, filed an amicus curiae brief for Foggy Bottom Association, in support of appellant.

Before SCHWELB and REID, Associate Judges, and KING, Senior Judge.

REID, Associate Judge:

Columbia Plaza Tenants' Association ("Tenants' Association") appeals from the judgment of the Superior Court of the District of Columbia granting appellees'[1] cross-motions for summary judgment. In essence, the Tenants' Association contends that the motions judge misconstrued a District law pertaining to a tenant's opportunity to purchase property prior to its sale, and that an agreement between identified limited partners of the Partnership and GWU, which allegedly was a "master lease," constituted a "sale" within the meaning of D.C.Code § 42–3404.02. Discerning no error on the part of the motions judge, we affirm the judgment of the Superior Court.

## FACTUAL SUMMARY

The record on appeal shows that the Partnership acquired ownership of an apartment complex or rental housing accommodation, known as Columbia Plaza Apartments, which consists of 800 apartment units in several buildings located at 2301 E Street, 500 23rd Street, 2400 Virginia Avenue, 2440 Virginia Avenue, and 2450 Virginia Avenue, in the Northwest quadrant of the District of Columbia. The limited partners of the partnership generally are composed of individuals, joint ventures, trusts, and other arrangements; the

---

1. The appellees are Columbia Plaza Limited Partnership ("the Partnership"), CP Real Estate, LLC ("CP Real Estate"), and George Washington University ("GWU").

limited partners do not control the management or operations of the Partnership. The administrative arm of the Partnership is its General Partner. As of December 1999, the Partnership's sole General Partner was Dr. Laszlo N. Tauber.[2]

On December 17, 1999, various limited partners of the Partnership, the Partnership itself through its General Partner, Dr. Tauber, and GWU, executed an agreement for the sale of certain partnership interests ("the Agreement"). The Agreement was amended to bring the total interest in the Partnership which was sold to GWU to 28.5559354%. Subsequently, as of January 11, 2000, CP Real Estate had replaced Dr. Laszlo Tauber as General Partner,[3] and on February 16, 2000, the Gould Properties Limited Partnership also became a General Partner of the Partnership.

The Tenants' Association filed suit against the Partnership, GWU, and CP Real Estate in December 2002. The complaint alleged that "[o]n information and belief, Defendant executed a secret contract ... with GWU which permits GWU to operate a de facto student dormitory at the [Columbia Plaza Apartment complex]." The complaint contained two counts. The first count alleged a violation of D.C.Code § 42–3404.02 (2001), commonly known as the Tenant Opportunity to Purchase and Sale Act ("TOPA"), in that the Agreement allegedly constituted a "sale," and the Partnership and its General Partner failed to give the required notice of offer of sale to the tenants prior to the execution of the agreement with GWU.

Between July and September 2003, the parties filed cross-motions for summary judgment. On October 15, 2003, the motions judge docketed a memorandum denying the Tenants' Association's motion, but granting the cross-motions of the Partnership and CP Real Estate, and GWU. The court focused on the meaning of a "sale" under D.C.Code § 42–3404.02(b) and (c). The court's discussion also centered on Article 15 of the Agreement. After analyzing the applicable statutory provisions and the pertinent section of the agreement, the court concluded that there was no "sale" under TOPA because the Partnership and its General Partner did not "relinquish possession of the [Columbia Plaza Apartment complex]," within the meaning of D.C.Code § 42–2404.02(b)(1). And, the court determined that under the Agreement, "GWU 'continue[s] the management of the Columbia Apartments.'" Furthermore, the court declared that the agreement did not "extend[ ] an option [to GWU] to purchase an ownership interest in the [Columbia Plaza Apartment complex]" under D.C.Code § 42–3404.02(b)(5). At most, GWU had "a contingent option." While the motions court did not explicitly examine whether the Agreement rose to the level of a "master lease" within the meaning of D.C.Code § 42–3404.02(c), it implicitly rejected that possibility by pointing out that: "A 'sale' also includes a 'master lease' which meets some, but not all, of the factors described in [D.C.Code § 42–3404.02(b)]." Since the factors set forth in § 42–3402.02(b)(2), (3), (4), and (6) are not raised by the Agreement, and the trial court concluded that subsections (1) and (5) in § 42–3402.02 were not met in this case, the judge implicitly concluded that the requirements of § 42–3404.02(c) were not satisfied.

## ANALYSIS

The Tenants' Association mainly contends that, despite its title, the Agreement

**2.** Dr. Tauber, and members of his family, also had interests as limited partners.

**3.** The beneficial interests in CP Real Estate are owned by Dr. Tauber's estate.

"is ... a master lease within the meaning of the District's Rental Housing Conversion and Sale Act such that tenants' rights to purchase [the Columbia Plaza Apartment complex] were triggered." Hence, the Tenants' Association maintains that the motions court erred in granting summary judgment to appellees. Appellees primarily argue that the said agreement is not a master lease and that a "sale" within the meaning of the TOPA did not occur. Thus, the trial court properly granted appellees' cross-motions for summary judgment.

We "review a grant or denial of a motion for summary judgment *de novo* to determine whether any genuine issue of material fact exists and whether the prevailing party was entitled to judgment as a matter o[f] law." *Evans v. Medical Inter–Ins. Exch.*, 856 A.2d 609, 612 (D.C.2004) (citing *Herbin v. Hoeffel*, 806 A.2d 186, 190 (D.C.2002) (other citation omitted)). In this case, "[w]e review the record in the light most favorable to the appellant ...,  drawing all reasonable inferences in [the Tenants' Association's] favor." *Id.* (citing *Herbin, supra*, 806 A.2d at 191 (other citation omitted)). "We will affirm the entry of summary judgment if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Kelley v. Broadmoor Co-op. Apartments*, 676 A.2d 453, 456 (D.C.1996) (citations and internal quotation marks omitted).

In interpreting statutory provisions, we are guided by several fundamental legal principles. "We look to the plain meaning of a statute first, construing words according to their ordinary meaning." *Boyle v. Giral*, 820 A.2d 561, 568 (D.C.2003) (citing *J. Parreco & Son v. Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989)). "The literal words of [a] statute, however, are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *Id.* (citing *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C.1999) (other citations, footnotes and internal quotation marks omitted)). "In addition, we must inquire whether our interpretation is 'plainly at variance with the policy of the legislation as a whole' requiring that we remain faithful more to the purpose than the word." *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 726 n. 14 (D.C.1994) (quoting *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). Consequently, "[i]n appropriate cases, we also consult the legislative history of a statute." *Abadie v. District of Columbia Contract Appeals Bd.*, 843 A.2d 738, 742 (D.C.2004) (citing *Kelly v. District of Columbia*, 765 A.2d 976, 978 (D.C.2001)).

### *The Statutory Framework and its Background*

In 1980, the Council of the District of Columbia enacted the Rental Housing Conversion and Sale Act of 1980 ("the Act"), D.C. Law 3–86, September 10, 1980, 27 DCR 2975 (1980), Title IV of the Act is known as the Tenant Opportunity to Purchase Act of 1980 ("TOPA"). Section 401 of the Act, 27 DCR 2991 (1980). The Act generally is designed to address the "continuing housing crisis in the District of Columbia" and the "severe shortage of rental housing available to the citizens of the District of Columbia." Section 101(a) and (b) of the Act, 27 DCR 2975 (1980). TOPA requires the "owner of a housing accommodation" to "give the tenant an opportunity to purchase the accommodation ..." prior to its sale. Section 402 of

the Act.[4] In 1989, TOPA was amended by adding a new subsection (b) (the "Tenant Opportunity to Purchase Clarification Amendment Act of 1989") which sought to define the words "sale" and "sell." Subsection (b) specified:

For the purposes of this subchapter, the terms "sell" or "sale" includes the execution of any agreement that assigns, leases, or encumbers property, pursuant to which the owner:

(1) Relinquishes possession of the property;

(2) Extends an option to purchase the property for a sum certain at the end of the assignment, lease, or encumbrance and provides that a portion of the payments received pursuant to the agreement is to be applied to the purchase price;

(3) Assigns all rights and interests in all contracts that relate to the property;

(4) Requires that the costs of all taxes and other government charges assessed and levied against the property during the term of the agreement are to be paid by the lessee either directly or through a surcharge paid to the owner;

(5) Extends an option to purchase an ownership interest in the property, which may be exercised at any time after execution of the agreement but shall be exercised before the expiration of the agreement; and

(6) Requires the assignee or lessee to maintain personal injury and property damage liability insurance on the property that names the owner as the additional insured.

36 DCR 5790–91 (1989); now codified at D.C.Code § 42–3404.02(b).

TOPA was amended again in 1994/1995. At the time of the amendment, *West End Tenants Ass'n, supra*, was pending in this court. This case concerned a lease agreement (known as the "Master Lease"), *id.* 640 A.2d at 721, between the owners of the West End Apartments (located at 2124 I Street, N.W.) and GWU. The term of the lease was ten years, and GWU was to be paid $25,000 per month or $300,000 per year under the lease. *Id.* at 723. GWU was given the "exclusive right to purchase" the West End Apartments "for $6 million, minus a $100,000 credit per rental year, for a net amount of $5 million." *Id.* Although GWU's "exclusive right to purchase" was subject to the tenants' right to purchase, *id.*, the West End Tenants' Association sought a declaratory judgment that the owners and GWU had violated the Act because the "Master Lease" constituted a "sale" within the meaning of § 42–3404.02(b) of TOPA, as amended in 1989. *Id.* at 722, 723. During the appeal, the Council of the District of Columbia considered, and after the appeal had been decided, enacted the permanent version of the "Rental Housing Conversion and Sale Act of 1980 Reenactment and Amendment Act of 1995." 42 DCR 3239 (1995),[5] which added subsection (c) to Section 402 of TOPA. Subsection (c) provided in pertinent part:

For purposes of this title, the term "sell" or "sale" includes the transfer of 100% of all partnership interests in a partnership which owns the accommodation as its sole asset to 1 transferee or of

---

**4.** As originally enacted, section 402 provided in pertinent part:

Before an owner of a housing accommodation may sell the accommodation ..., the owner shall give the tenant an opportunity to purchase the accommodation at a price

and terms which represent a bona fide offer of sale.

27 DCR 2991 (1980); D.C.Code § 45–1631 (1981).

**5.** The amended Act became law effective September 6, 1995 (D.C. Law 11–31).

100% of all stock of a corporation which owns the accommodation as its sole asset to 1 transferee in 1 or more transactions occurring during a period of 1 year from the date of the first such transfer, *and a master lease which meets some, but not all of the factors described in subsection (b). of this section or which is similar in effect ....*

Section 402(c), currently codified at D.C.Code § 42–3404.02(c) (2001) (emphasis added). The Council's section by section analysis of the subsection (c) amendment states in relevant part:

> This subsection amends section 402 ... to include, within the term "sale" or "sell", the transfer of one hundred percent of all partnership interests [or] fundamental control of ownership of the rental accommodation. Included specifically would be master leases and sale of a one hundred percent interest in a corporation or partnership.
>
> There was extensive discussion at the hearing on the Tenant Opportunity to Purchase Clarification Amendment Act of 1989 (D.C. Law 8–49) concerning transactions which are encompassed within the term "sale." It was generally agreed that all changes in fundamental control of ownership were intended to be covered, but the legislative history was not clear on this point. There was a particular lack of clarity caused by the introduction of a provision in ... The Rental Housing Conversion and Sale Act of 1980 Amendments and Extension Act of 1983. That provision would have explicitly covered sale of majority interest in corporations and partnerships, but was removed in response to the Mayor's position that such sales were not occurring and that they could not be monitored because they did not have to be recorded. Today, it is clear that such

sales do occur and now they do have to be recorded ....

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, COMMITTEE REPORT ON BILL 11–53, THE "RENTAL HOUSING CONVERSION AND SALE ACT OF 1980 REENACTMENT AND AMENDMENT ACT OF 1995," March 14, 1995 ("the Committee Report"), p. 10.

### The Partnership/GWU Agreement

As set forth in the Agreement, and in related correspondence, some of the limited partners of the Partnership agreed to sell approximately 28.6 percent of their Partnership interests to GWU for the sum of $24,743,718.02. Article 15 of the Agreement, which was to survive the closing on the sale of Partnership interests, specified in an introductory paragraph that:

> For purposes of any and all agreements under this Article 15, [GWU] is and shall be deemed to be acting, now and in the future, as an entity independent of the Partnership, and not as a limited partner, such that in no event shall [GWU] be deemed to be participating in management or operation of the business of the Partnership or of the Property [i.e., the 800 unit Columbia Plaza Apartment complex].

Article 15(A) provided that existing GWU tenants would be placed under GWU's Code of Student Conduct and would be subject to the "disciplinary procedures and remedies" of that Code. Furthermore, the Partnership and its management company retained responsibility for providing security at the apartment complex, and for "prosecut[ing] landlord and tenant actions and eviction proceedings in the Partnership's name against student tenants as the University so instructs." Under Article 15(D), as additional apartment units became vacant, the Partnership agreed to

provide written notice to GWU and to permit the university to designate a GWU student or faculty member for the vacancy, prior to placing the unit on the market. Yet, Article 15(D) also provided that the designated student or faculty member "shall enter into a direct lease" with the Partnership and that GWU would not be a party or obligated under such lease. Any student or faculty member designated pursuant to the Agreement, is required to enter into a "Columbia Plaza Housing Program Agreement" with GWU. That agreement explicitly provides in paragraph 5(A) that "[e]ach occupant will be required to execute a lease agreement with Columbia Plaza."

### Interpretation of TOPA and the Agreement

■ We turn now to the Tenants' Association's argument that "[u]nder TOPA, a 'master lease' is included in the definition of 'sell,' [so] that tenants must be afforded notice and opportunity to purchase upon execution of a master lease." The term "master lease" appears in D.C.Code § 42–3404.02(c), but is not defined. In relevant part § 42–3404.02(c) provides: "[T]he term "sell" or "sale" includes ... a master lease which meets some, but not all, of the factors described in subsection (b) of this section or which is similar in effect." The Tenants' Association further contends that the Agreement between GWU, and the Partnership and its General Partner, "is similar in effect to Factor 1 ['Relinquishes possession of the property'] in that it conveys the right to use and occupy [units at the Columbia Plaza Apartment complex] in exchange for consideration and Factor 5 ['Extends an option to purchase an ownership interest in property ....'] in that it extends an option to purchase an ownership interest in the [Columbia Plaza Apartment complex], which may be exercised at any time after execution of the [A]greement."

In *West End Tenants Ass'n, supra,* we determined that § 42–3404.02(b) was designed "to reach the Master Lease Agreement" at issue in that case, and that subsection (b) "define[d] a sale to include the *very* provisions included in the lease entered into between GWU and [the owners of the West End Apartments]." *Id.* 640 A.2d at 736 n. 36.[6] We concluded that the 1989 amendment to TOPA "redefine[d] the term 'sale' in a manner that plainly mirrored the terms of the Master Lease involved in this [*West End Tenants Ass'n*] case."[7] *Id.* at 731. Under the Master Lease in that case, unlike the Agreement in this case, GWU gained control over equipment and supplies at the West End Apartments, as well as the right to challenge real estate assessments levied against the property. *Id.* at 724. In addition, under that Master Lease, but not the Agreement in this case, GWU was obligated to pay the real property taxes, perform all maintenance work and repairs, obtain all non-transferable permits, and to purchase liability insurance. *Id.*

---

6. We concluded, however, that, "as applied to the Master Lease" at issue in *West End Tenants Ass'n, supra,* subsection (b) was "unconstitutional as violative of the Contracts Clause" of the Constitution of the United States. *Id.* at 736 (footnote omitted).

7. We also said that subsection (b) "defines 'sale' in a manner that unmistakably mirrored the Master Lease involved in [in *West End Tenants Ass'n*] which was then pending before the trial court ... to 'include' all agreements by which an owner relinquishes control of property, gives the party in control an option to purchase with interim payments to be applied to the purchase price; obligates the controlling party to pay taxes and insurance coverage; *and* allows the controlling party to purchase ownership interests in the property." *Id.* at 724.

The legislative history accompanying the 1995 addition of subsection (c) to § 402 of TOPA assists in an understanding of the legislature's intent. The section by section analysis of the proposed subsection (c) contained in the Committee Report referenced the 1989 amendment which added subsection (b) and stated:

> There was extensive discussion at the hearing on the Tenant Opportunity to Purchase Clarification Amendment Act of 1989 (D.C. Law 8–49) concerning transactions which are encompassed within the term "sale." It was generally agreed that all changes in fundamental control of ownership were intended to be covered, but the legislative history was not clear on this point. There was a particular lack of clarity caused by the introduction of a provision in Bill 5–162, The Rental Housing Conversion and Sale Act of 1980 Amendments and Extension Act of 1983. That provision would have explicitly covered sale of majority interest in corporations and partnerships, but was removed in response to the Mayor's position that such sales were not occurring and that they could not be monitored because they did not have to be recorded. Today, it is clear that such sales do occur.

Committee Report, at 10. From this passage the legislature envisioned the critical concept, in assessing whether an owner had "relinquishe[d] possession of the property," to be "change in fundamental control of ownership." Indeed, Richard C. Eisen, who was counsel for the tenants association in *West End Tenants Ass'n, supra,* gave testimony during the Council's consideration of proposed subsection (c), which not only referenced the *West End* case, but also focused on the concept "change in fundamental control of ownership." Mr. Eisen even suggested that instead of defining this concept to embrace "transfer of 51% of the partnership interests," perhaps it should be defined to "mean transfer of 75% or more of ownership interests, instead of a simple majority." [8]

In the case before us the Agreement does not fall within D.C.Code § 42–3404.02(b)(1)—"relinquishes possession of the property." The Partnership has not relinquished its possession of the Columbia Plaza Apartment complex to GWU. There has been no "change in fundamental control of ownership." GWU acquired substantially less than a 51% interest in the Partnership. It acquired that interest as a limited partner, rather than as a general partner in charge of managing the Partnership. While GWU has the right to designate its students and faculty for a vacancy, it does not have the kind of control or obligations evidenced in *West End Tenants Ass'n, supra,* with respect to equipment, supplies, permits, payment of taxes, maintenance and repairs, and liability insurance. Nor does it have any responsibility for managing or operating the apartment complex, or executing a lease directly with a GWU student or faculty member, or for security at the premises, or landlord and tenant actions and evictions. As the trial court determined, although GWU "may instruct" the Partnership "to evict a student if the student violates the [C]ode of [Student] [C]onduct ... or ceases to be a student in good standing," nothing in the Agreement precludes the Partnership from taking eviction actions against a GWU student or faculty member in the event of lease violations. Our review of the Agreement leads

---

**8.** Testimony of Richard C. Eisen, September 23, 1993, at 11–13 (attached to the Committee Report).

us to conclude that the Partnership did not "relinquish possession of the [Columbia Plaza Apartment complex]." D.C.Code § 42–3404.02(b)(1). As the trial judge aptly put it: "[T]he words 'relinquish possession' do not mean the limited control given to GWU in the present case," and "relinquish possession of the property means giving up more control than GWU has done in this [A]greement."

Nor does the Agreement fall under D.C.Code § 42–3404.02(b)(5): "Extends an option to purchase an ownership interest in the property, which may be exercised at any time after execution of the agreement but shall be exercised before the expiration of the agreement." D.C.Code § 42–3404.02(b)(5). Article 15(B) of the Agreement obligates the owner of any limited partner interest in one group of limited partners, the Tauber Group, who desires to sell a limited partner interest to "make a written offer to sell" that interest first to GWU. The words "option to purchase" do not appear in Article 15(B). Instead, GWU is granted a right of first offer. Furthermore, Article 15(B) excludes certain Tauber Group limited partnership interests from the reach of the right of first offer, such as those earmarked for transfer to family members or to charitable organizations as a donation through a will. In addition, Article 15(B) states that after the sale of partnership interests under the Agreement, the Tauber Group owned "28% of all of the partnership interests in the Partnership." Thus, the Agreement mentions no "option to purchase" and it is quite clear that Article 15(B) covered only 28% of the Partnership interests, and all of those interests were not included in the provision requiring the transmittal to GWU of a written offer to sell the specified limited partnership interests. Moreover, in *West End Tenants Ass'n, supra,* we indicated that all that GWU could have had under the Master Lease in that case

was "a right of election" which would permit it to "exercise a privilege, and only when that privilege has been exercised by acceptance [would] it become a contract to sell ...." *Id.* at 728 (quoting 8A GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 4443, at 257 (1963 Repl.) (internal quotation marks omitted)). The right which GWU acquired in Article 15(B) is not a sale within the meaning of TOPA. That right not only involves less than 30% of the total ownership interests of the Columbia Plaza Apartment complex, but also given the exclusions of interests that are subject to GWU's right of first offer in Article 15, a written offer may never be extended to GWU by the Tauber Group. As the motions court recognized, " [i]f a [Tauber Group limited partner] never decides to transfer an interest except to a family member or a charity, GWU will never have an option to buy it." As the trial court declared in relying on THOMPSON, *supra,* "[a]n option to purchase ... gives the optionee a privilege of buying property within a specified time on terms and conditions expressed in the option." That is not the case here. Under these circumstances, the Agreement does not satisfy the requirements of D.C.Code § 42–3404.02(b)(5).

Since the Agreement satisfies neither Factor 1 nor Factor 5 of the statutory definition of a "sale," we agree with the trial court that it does not constitute a "sale" within the meaning of D.C.Code § 42–3404.02(b). And, because statutory Factors 1 and 5 are not satisfied, the Agreement is not a "master lease" within the meaning of § 42–3404.02(c) because there is no showing that the Agreement "meets some, but not all of the factors described in subsection (b) [of § 42–3404.02]." Appellant's argument that the words "or which is similar in effect" which

appear in § 42–3404(c) demonstrate that the Agreement is a "sale" under TOPA is unpersuasive. Consistent with statutory interpretation principles, we examine the plain meaning of the statute and interpret the words according to their ordinary meaning. *Boyle, supra,* 820 A.2d at 568 (citation omitted). We also read these words in light of the Act and TOPA as a whole. *Id.* (citations omitted). And we construe the words in a manner that is not "at variance with the policy of the legislation as a whole." *West End Tenants Ass'n, supra,* 640 A.2d at 726 n. 14. Applying these principles, it is obvious that the words "or which is similar in effect" are designed to reach a document which is akin to a "master lease" and which meets some but not all of the factors codified in § 42–3404(b). In light of the statutory factors on which the appellant relies and the nature of the Master Lease in *West End Tenants Ass'n, supra,* and given our analysis as reflected above, we are satisfied that the Agreement in this case is not "similar in effect" to that of a master lease, as that term is understood in § 42–3404(c). In short, the Agreement is not a "sale" within the meaning of TOPA, and appellees had no obligation to give the tenants an opportunity to purchase the Columbia Plaza Apartment complex.

Accordingly, for the foregoing reasons, we affirm the judgment of the motions court.

*So ordered.*